UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CLAUDIA S. MARTIN, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 17 C 2330 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| COOK COUNTY, ILLINOIS, a municipal corporation within the State of Illinois, THE OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS, as the employer directing personnel of the COOK COUNTY ADULT PROBATION DEPT., LAVONE HAYWOOD, MATTHEW SOBIESKI, DARRYL GRAY, and NOREEN LARSON, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claudia Martin, a probation officer employed by the Cook County Adult Probation Department, sues Cook County, the Office of the Chief Judge of the Circuit Court of Cook County, and several Probation Department employees under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and state law for allegedly discriminating against and harassing her due to her religious beliefs and union activities. Doc. 46. Cook County and the Probation Department employees move under Federal Rule of Civil Procedure 12(b)(6) for partial dismissal of the operative complaint. Doc. 50. Specifically, Cook County moves to dismiss all claims against it—save a state law indemnification claim—on the ground that it is not Martin's employer and thus not liable for the misconduct she alleges, while Probation Department employees Lavone Haywood, Matthew Sobieski, Darryl Gray, and Noreen Larson move to dismiss Martin's intentional infliction of emotional distress claim on the

1

ground, among others, that it is preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/8-111(D). The motion is granted.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Martin's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The facts are set forth as favorably to Martin as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Martin is a probation officer for the Cook County Adult Probation Department. Doc. 46 at ¶ 14. In 2006, she became a steward for Local 3468 of the American Federation of County, State, and Municipal Employees ("AFCSME"), the union that represents Probation Department employees, and she was promoted to chief steward in 2012. *Id*. at ¶¶ 17, 21, 29, 177-178. A practicing Muslim, Martin typically wears a hijab. *Id*. at ¶¶ 24-25. During the relevant time period, Martin's supervisors favorably reviewed her work. *Id*. at ¶¶ 32-36.

At some point in 2013 or 2014, Martin filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that her then-supervisor had an "issue" with her hijab. *Id*. at ¶ 72. Larson, the Probation Department's director of human

resources, pressured Martin to drop the charge. *Id*. at ¶¶ 73-74. The Probation Department otherwise took no action regarding Martin's complaint. *Id*. at ¶ 75.

On January 20, 2015, Martin received an anonymous letter expressing anti-union sentiment. *Id*. at ¶ 20. The letter stated in relevant part: "The Union's tjme [sic] is up!!!!!!!! You don't work for ASFSCME [sic]! You work for the Adult Probation Department! You need to decide[] if you want to risk your children not eating, because you are defending people who don't do their work and lie about and justify their actions." *Ibid*. (emphasis omitted). The president of Local 3468, James Dunaway, wrote to Cook County Chief Judge Timothy Evans, asking him to address the letter. *Id*. at ¶ 21. Chief Judge Evans did not respond. *Id*. at ¶ 22.

Beginning in October 2015 and continuing for the next several months, Gray, a Deputy Chief Probation Officer, told Martin on several occasions that unidentified coworkers had complained about her wearing a hijab and cautioned her that wearing a "hat" in the workplace was against Probation Department policy. *Id*. at ¶¶ 23, 26, 28, 31, 37-38. Martin felt bullied by these interactions, and consulted with Dunaway, who contacted the Probation Department's human resources department on her behalf. *Id*. at ¶¶ 39-41.

In mid-December 2015, after Martin came to work on several occasions without her hijab, Gray conveyed to her an anonymous complaint about her "apparent inconsistency" in wearing the hijab. *Id*. at ¶¶ 42-43. Martin explained that she had chosen not to wear her hijab at certain times due to a scalp condition. *Id*. at ¶ 44. Gray asked Martin to provide a doctor's note about her scalp condition, which prompted Martin to email Larson to ask why the documentation was necessary. *Id*. at ¶¶ 45-46. Larson responded: "The Office of Human Resources has approved your wearing of [a] head covering. Though it is against policy and procedure, this exemption will be allowed as it is for religious reasons. You are now, however, indicating that it

3

will be intermittent due to medical reasons. Therefore, we are requesting medical documentation." *Id.* at ¶ 48. Martin provided a doctor's note, and on the day that she received Larson's response, she filed a discrimination charge with the Illinois Department of Human Rights ("IDHR"). *Id.* at ¶¶ 47, 49.

On December 18, Martin discovered an anonymous note on her desk chair, written in printed cutout letters and stating: "What R U an Isis Muslim no bombs allowed." *Id.* at ¶ 50. Martin immediately sought out Dunaway. *Id.* at ¶ 51. Later that day, Gray intercepted Martin when she was on her way to speak with her direct supervisor about the note. *Id.* at ¶¶ 53-56. After leaving Gray's office, Martin stopped to talk with her supervisor. *Id.* at ¶¶ 57-59. Gray walked over to join the pair, and then "raised his voice, and embarrassed, insulted, humiliated, and berated" Martin in front of her supervisor. *Id.* at ¶ 60. Martin attempted to file a police report, but was instructed to instead report the incident to the IDHR. *Id.* at ¶¶ 62-64.

On December 22, Martin emailed Chief Judge Evans as well as Haywood, the Chief Probation Officer, and Sobieski, a Deputy Chief Probation Officer, to inform them of the hijab-related incidents, including Gray's conduct after learning of the anonymous note. *Id.* at ¶¶ 65-66. Martin's email stated that after she received the "hateful and humiliating letter, Mr. Gray … publicly humiliated [her] by speaking to [her] in a very hostile and aggressive tone and in an unprofessional manner in front of other coworkers." *Id.* at ¶ 66. Martin received no response. *Id.* at ¶ 67.

Martin also prepared a formal incident report. *Id.* at ¶ 76. Sobieski later spoke with Martin, insisting that she remove references to Gray's harassment and promising that the Cook County Sheriff's Office would investigate. *Id.* at ¶¶ 76-77. At Sobieski's direction, Martin

4

revised the incident report several times.  *Id*. at ¶ 78.  Neither the Sheriff's Office nor the Probation Department investigated the note.  *Id*. at ¶¶ 79-82.

Martin experienced additional harassment beginning on June 14, 2016.  *Id*. at ¶¶ 84-85.  Another probation officer, David Neeley, alleged that Martin had interfered with his official duties in the courtroom where the case of a probationer assigned to Neeley was scheduled to be heard.  *Id*. at ¶¶ 86-91.  On September 14, 2016, Martin was suspended based on Neeley's allegations.  *Id*. at ¶ 97.  The suspension letter was prepared before Martin received the opportunity to respond.  *Id*. at ¶¶ 96, 103-104.

After Chief Judge Evans authorized and approved the suspension, the union filed a grievance, charging that the suspension constituted retaliation for Martin's union activity and the agency charges she had filed.  *Id*. at ¶¶ 107-108.  The day of her suspension, Martin filed a second charge with the IDHR.  *Id*. at ¶ 109.  Martin's workstation was then reassigned, forcing her to sit next to a probation officer who had sought to have her removed as a union official.  *Id*. at ¶¶ 111-112, 117.  In addition, Gray shared with other Probation Department employees the details of a confidential factfinding conference held at the IDHR in January 2017; those employees later demonstrated hostility to Martin.  *Id*. at ¶¶ 113, 115, 121.

At some point before February 8, 2017, Martin contacted Larson to "request … a location within the workplace in which to exercise [her] religious beliefs," including prayer.  *Id*. at ¶ 120.  Larson granted the request that day, telling Martin that she would be given access to a "designated … temporary quiet space" that Gray would show her.  *Ibid*.  Approximately a month later, Martin emailed Larson because neither Gray nor Larson had shown her the designated space.  *Id*. at ¶ 127.  Larson responded, indicating again that Gray would show Martin the space so that she could begin using it "immediately."  *Id*. at ¶ 128.  Gray did show Martin the space,

but instructed her to inform her supervisor, or him, before using it for prayer. *Id*. at ¶¶ 129-131. Martin found this rule "unsettling." *Id*. at ¶ 135. Given that the space was next to Gray's office and had been empty since late December 2016, Martin believed that Larson and Gray were "disingenuous" in accommodating her religious practice. *Id*. at ¶¶ 134, 136-137, 139.

On March 16, 2017, Martin noticed the following anonymous message written on a wall of the Probation Department's employees-only women's restroom: "County Stank Bitch C Martin." *Id*. at ¶ 142. Discovering the note caused Martin "tremendous emotional anxiety and mental discomfort." *Ibid*. Martin fears that she will be transferred to a work location that is farther away from her son's school and that she will lose her position as Interstate Compact Compliance Officer, a highly sought-after position within the Department. *Id*. at ¶¶ 145-148.

## Discussion

### I. Non-Indemnification Claims Against Cook County

Cook County contends that all of Martin's claims against it, save her state law indemnification claim, should be dismissed, reasoning that because neither Chief Judge Evans nor the other individual defendants are Cook County employees, the County is not liable for their conduct. Doc. 50 at 3-6; Doc. 61 at 1-2. In response, Martin indicates that she has "little more to offer on the subject than has been suggested" in the motion to dismiss. Doc. 54 at 2. This concession amounts to a forfeiture. *See Firestone Fin. Corp v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss."); *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."). Cook County is correct on the merits in any event.

"[F]ederal courts look to state law to determine if a defendant is amenable to suit." *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 n.2 (7th Cir. 2000) (citing Fed. R. Civ. P. 17(b)). Under Illinois law, the Probation Department "has no legal existence apart from the Office of the Chief Judge." *Flanagan v. Cook Cnty. Adult Prob. Dep't*, 2016 WL 1595065, at *3 (N.D. Ill. Apr. 21, 2016); *see also Cobb v. Cnty. of Cook*, 179 F.R.D. 222, 223 n.1 (N.D. Ill. 1998) (noting that the Cook County Adult Probation Department is "not a legal entity"). Illinois law instead provides that "[t]he chief judge of each circuit shall make provision for probation services for each county in his or her circuit." 705 ILCS 405/6-1(1); *see also* 705 ILCS 405/6-3(1) & (2) (providing that "[a]ny county having more than 1,000,000 inhabitants shall maintain a Court Services Department, which shall be under the authority and supervision of the chief judge of the circuit," and that the "functions and duties of probation personnel of the Court Services Department include, but are not limited to, those described in Section 6-1"). Accordingly, the chief judge of each circuit appoints that circuit's chief probation officer and "all other probation officers." 730 ILCS 110/15(2)(b).

In *Moy v. County of Cook*, 640 N.E.2d 926 (Ill. 1994), in holding that the Cook County Sheriff was an officer rather than a Cook County employee, the Supreme Court of Illinois explained that courts look to the "following characteristics" as "indicia of an office, as contrasted with simple employment":

> (1) the positions are created by law; (2) their compensations are required to be fixed by the county board and paid out of the county treasury; (3) they exercise some portion of the sovereign power of the State; (4) their duties are not prescribed by contract or agreement, but by law; and (5) they are not engaged to perform a special act, the completion of which ends their duty, but the duties of the positions are continuous, without regard to the particular person who holds the office.

*Id*. at 930. Each factor is satisfied here. The state constitution provides for a chief judge to be selected from among the ranks of circuit judges and specifies the position's duties. *See* Ill.

Const. art. VI, § 7(c) ("Circuit Judges in each circuit shall select by secret ballot a Chief Judge from their number to serve at their pleasure. Subject to the authority of the Supreme Court, the Chief Judge shall have general administrative authority over his court, including authority to provide for divisions, general or specialized … ."). The state constitution also sets forth the duties, terms of office, and salaries of circuit judges. *See* Ill. Const. art. VI, §§ 7-14. Indeed, the Chief Judge "is a step further away [than the Cook County Sheriff] from having an employment relationship with Cook County because he is a *state* officer whose office was constitutionally created under the judiciary article." *Biggerstaff v. Moran*, 671 N.E.2d 781, 784 (Ill. App. 1996) (emphasis added) (holding, based on *Moy*, that Cook County Assistant State's Attorneys are not Cook County employees); *see also People ex rel. Landers v. Toledo, St. Louis & W. R.R. Co.*, 107 N.E. 879 (Ill. 1915) (same).

Martin does not allege that Cook County itself took any action against her. And because the County is not the Chief Judge's employer, the County cannot be held vicariously liable for the actions of the Chief Judge or of anyone under the Chief Judge's supervision. *See Moy*, 640 N.E.2d at 931 (affirming dismissal of vicarious liability claims against Cook County based on the actions of the Cook County Sheriff, reasoning that because the Sheriff "is not in an employment relationship with the County of Cook[,] … the county may not be held vicariously liable for the sheriff's alleged negligent conduct"); *Biggerstaff*, 671 N.E.2d at 784 (holding that "Cook County is not vicariously liable for the negligent actions of an assistant State's Attorney"); *Kuttner v. Zaruba*, 2013 WL 5433291, at *6 (N.D. Ill. Sept. 30, 2013) (granting judgment to DuPage County on a Title VII claim against the DuPage County Sheriff, where the plaintiff "has neither alleged nor shown that the County was responsible for any discrimination or retaliation against her," and noting that "there is no *respondeat superior* liability against the

8

County for the acts of the Sheriff, because the Sheriff is an independently-elected officer rather than an employee of the County") (citing *Moy*, 630 N.E.2d at 929), *aff'd*, 819 F.3d 970 (7th Cir. 2016); *French-Fuentes v. Lake Cnty.*, 2000 WL 1760970, at *2 (N.D. Ill. Nov. 30, 2000) (same).

Likewise, because Martin identifies no County policies, practices, or procedures that injured her, Doc. 46 at ¶¶ 198-204, her allegations against Cook County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), fail to state a claim as well. *See Conwell v. Cook Cnty.*, 2015 WL 4973086, at *4 (N.D. Ill. Aug. 18, 2015) (dismissing a *Monell* claim against Cook County brought by a former Cook County Jail detainee because, under *Moy*, "it falls within the purview of the Sheriff's Office, not Cook County, to implement the policies and procedures within the Jail"). Nevertheless, as Cook County acknowledges, Doc. 50 at 5-6, because under *Carver v. Sheriff of La Salle County*, 787 N.E.2d 127, 129 (Ill. 2003), the County "has a duty to pay judgments against" the Chief Judge "for any official capacity claims," Cook County must "remain a defendant," albeit for indemnification only, "as a necessary party to this case." *Kuttner*, 2013 WL 5433291, at *6.

## II. Intentional Infliction of Emotional Distress Claim

The Probation Department employees contend that Martin's intentional infliction of emotional distress claim is preempted by the IHRA. Doc. 50 at 8-11. The IHRA makes it a "civil rights violation … [f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2-102(A). The term "unlawful discrimination" includes "discrimination against a person because of his or her … religion." 775 ILCS 5/1-103(Q). In addition, the IHRA makes it a "civil rights violation … to

… [r]etaliate against a person because [1] he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination … [2] because he or she has made a charge … under this Act, or [3] because he or she has requested … a reasonable accommodation as allowed by this Act." 775 ILCS 5/6-101(A).

The IHRA contains a preemption provision: "Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). Under this provision, the IHRA "preempts all state law claims seeking redress for a civil rights violation within the meaning of that statute." *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (alteration and internal quotation marks omitted). "However, where a course of conduct states an independent state law claim, that independent claim is not preempted by the IHRA." *Ibid*. A claim is independent of the IHRA "if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish[] the legal duty that the defendant was alleged to have breached.'" *Id*. at 516-17 (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997)); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) ("The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached."); *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) ("[P]laintiff here established a basis for imposing liability on defendants independent of the [IHRA], *i.e.*, without reference to the legal duties created by the [IHRA]."). Thus, "whether [a] … court may exercise jurisdiction over a tort claim depends upon whether the tort claim is *inextricably linked* to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic*, 687 N.E.2d at 23 (emphasis added).

Applying these principles, the Seventh Circuit in *Krocka* held that the IHRA preempted emotional distress claim grounded in "several statements made by [Chicago Police Department] employees that referred to" the plaintiff's depression. 203 F.3d at 517. *Krocka* reasoned that the comments—the basis for a related claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*—"were inextricably linked to [the plaintiff's] disability discrimination claim because they were only offensive to the extent that they referred to [his] disability." *Id*. at 511, 517. Similarly, in *Geise v. Phoenix Co. of Chicago*, 639 N.E.2d 1273, 1277-78 (Ill. 1994), the Supreme Court of Illinois held that certain claims against the plaintiff's employer ostensibly sounding in negligence—specifically, "negligent hiring" and "negligent retention"—were "inextricably linked" to "the concept of sexual harassment" and therefore preempted by the IHRA. As the court explained, "it seems likely that these allegations were actually included for no reason other than to provide some basis for extending to Phoenix, the employer, responsibility for the sexual harassment committed by Walthall, one of its supervisory employees." *Id*. at 1277. "Absent the allegations of sexual harassment, [the plaintiff] would have no independent basis for imposing liability on her former employer … ." *Ibid*.

*Maksimovic* provides a contrasting case. There, in addition to her sexual harassment claim, the plaintiff also brought claims against her employer for assault, battery, and false imprisonment. 687 N.E.2d at 22. As the court summarized:

> In the assault count, Maksimovic alleged that Tsogalis threatened to "give her a stiff one up the ass," ordered her to perform oral sex on him, made comments about her breasts and accused her of being too friendly with the customers. In the battery count, the plaintiff alleged that Tsogalis placed his hand under her skirt and grabbed her leg, grabbed her buttocks and touched her while attempting to kiss her. In the false imprisonment count, the plaintiff alleged that Tsogalis confined her in a walk-in cooler where he made sexual advances toward her.

11

*Ibid*. Despite the connection between the sexual harassment claim and the assault, battery, and false imprisonment claims, *Maksimovic* concluded the two were not "inextricably linked" because the plaintiff "alleged facts sufficient to establish the elements of" each tort independently, "without reference to legal duties created by the [IHRA]." *Id*. at 23. As the court emphasized, "[a]ssault, battery and false imprisonment … are intended to redress violations of bodily integrity and personal liberty," separate from whether those violations independently give rise to a cause of action for sexual harassment under the IHRA. *Id*. at 24; *see also Naeem*, 444 F.3d at 603 n.4 (explaining that an emotional distress claim that "involve[s] sexual elements" may survive preemption under the IHRA, provided that it does "not depend on the prohibitions against sex discrimination for its survival") (internal quotation marks omitted); *Blount*, 904 N.E.2d at 10 (holding that the IHRA did not preempt a claim that the plaintiff was fired in retaliation for refusing to commit perjury, reasoning that the "plaintiff need not and does not rely upon the public policy embodied in the [IHRA] to satisfy the elements of her common law tort claim"); *Benitez v. KFC Nat'l Mgmt. Co.*, 714 N.E.2d 1002, 1004, 1008-09 (Ill. App. 1999) (holding that the IHRA did not preempt the plaintiff's intrusion upon seclusion and emotional distress claims, which rested on the defendants' "systematic spying operation on plaintiffs through a hole in the ceiling of the KFC women's bathroom" and taking pictures of plaintiffs and later distributing them to others, because the "allegations went beyond claims of sexual harassment as defined by the [IHRA]").

Under these authorities, whether the IHRA preempts Martin's emotional distress claim depends on whether the "claim rests … [on] behavior that would be a tort no matter what the motives of the defendant." *Naeem*, 444 F.3d at 605. Here, "eliminating the civil rights component" from Martin's claim—that is, stripping it of allegations that involve her religious

beliefs or practices or the Probation Department's retaliation for her complaints about how it handled her religious accommodation requests—"takes the air out of the case." *Sanglap v. LaSalle Bank, FSB*, 345 F.3d 515, 519 (7th Cir. 2003). Unlike in *Maksimovic*, religion-based discrimination and retaliation are not "merely incidental" to Martin's emotional distress claim, 687 N.E.2d at 23; rather, they are "the core of [her] theory," *Smith v. Chi. Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1151 (7th Cir. 1999). It follows that the IHRA preempts the claim.

This result follows from *Sanglap*. Holding that the IHRA preempted an emotional distress claim for the closure of his bank account by a plaintiff suffering from epilepsy, schizophrenia, and depression, the Seventh Circuit explained that "[w]hat is arguably outlandish … is the suggestion that" the bank manager "had a prejudice against customers with medical conditions and thus closed [the plaintiff's] account to keep him out of the bank." 345 F.3d at 519-20 (internal quotation marks omitted). "Sanitized of the allegation that [the bank] treated him differently because of a disability, [the plaintiff] is left to argue that closing a bank account for *any* reason will support a claim for intentional infliction of emotional distress—a position that we are confident the Supreme Court of Illinois would reject." *Id*. at 520. For that reason, *Sanglap* affirmed dismissal of the emotional distress claim—while leaving in place the plaintiff's judgment on his ADA claim. *Id*. at 517, 520.

In this case, what is outlandish is the content of the anonymous messages, insofar as they express animus directed toward Martin due to her religion. Likewise outlandish are the Probation Department's alleged failures to respond appropriately to the hostility directed toward Martin, evidenced by Gray's conduct, including allegedly berating and shouting at Martin; Larson's and Gray's allegedly slow response to Martin's request for a designated worship space; and the Probation Department's alleged retaliation for Martin's complaints, including

13

authorizing her suspension after Neeley's complaint, leaking confidential information from an IDHR hearing, and transferring her workstation. Put otherwise, just as in *Krocka*, Defendants' alleged actions are offensive only to the extent they concern Martin's religious practices and the Probation Department's retaliation against her efforts to obtain appropriate religious accommodations. *See Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002) (holding the plaintiff's emotional distress claim was preempted because it "[was] supported by factual allegations identical to those set forth in her Title VII sexual-harassment claim"); *Smith*, 165 F.3d at 1151 ("[W]e think it clear that Smith's state-law theories sound primarily in racial discrimination and thus are not independent of civil rights law."); *Veazey v. LaSalle Telecomms., Inc.*, 779 N.E.2d 364, 371 (Ill. App. 2002) (holding that the IHRA preempted other state law claims where the plaintiff's theory of the case was that his employer "conspired to, and did, terminate his employment because he was Black," and thus "no basis independent of the [IHRA] exist[ed] for imposing liability") (internal quotation marks omitted). As a result, the IHRA preempts Martin's emotional distress claim.

## Conclusion

For the foregoing reasons, Defendants' partial motion to dismiss is granted. Martin's claims against Cook County other than the state law indemnification claim are dismissed, as is her emotional distress claim. Haywood, Sobieski, Gray, and Larson shall answer the surviving portions of the complaint—which include religious discrimination and retaliation claims under Title VII, and a First Amendment retaliation claim—by May 16, 2018.

April 25, 2018

United States District Judge