UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLAUDIA S. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 2330 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| COOK COUNTY, OFFICE OF THE CHIEF JUDGE OF | ) | |
| THE CIRCUIT COURT OF COOK COUNTY, | ) | |
| LAVONE HAYWOOD, MATTHEW SOBIESKI, | ) | |
| DARRYL GRAY, and NOREEN LARSON, | ) | |
| | ) | |
| Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Claudia Martin, a probation officer employed by the Cook County Adult Probation Department ("APD"), sues several APD employees (collectively, "County Defendants") and the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ") under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for allegedly discriminating against and harassing her due to her religious beliefs and union activities. Doc. 46. The court previously dismissed Martin's claims against Cook County (other than for indemnification) and her state law claims. Docs. 89-90 (reported at 2018 WL 1942654 (N.D. Ill. Apr. 25, 2018)). With discovery closed, Defendants move for summary judgment. Docs. 114, 118. Their motions are granted.

**Background**

The court recites the facts as favorably to Martin as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

OCJ has employed Martin as an APD probation officer since 2001.  Doc. 127-3 at ¶¶ 1-2; Doc. 127-4 at ¶ 4.  Martin has repeatedly received merit pay increases for exceeding her supervisors' expectations.  Docs. 146, 150 at ¶ 1.  APD, a division within OCJ, is located in the lower level of the George N. Leighton Criminal Courthouse, which houses the Circuit Court of Cook County's criminal division.  *Id*. at ¶ 9; Doc. 127-4 at ¶ 4.

All APD probation officers are members of American Federation of State, County and Municipal Employees ("AFSCME") Local 3486.  Doc. 127-4 at ¶ 9; Doc. 127-3 at ¶¶ 7, 9. Martin has served as the Local's chief steward since 2013 and its vice president since 2017. Docs. 146, 150 at ¶ 2.  As chief steward, Martin handles labor relations with APD management. Docs. 127-3, 127-4 at ¶ 9.

**A.  Anonymous January 2015 Anti-Union Letter to Martin**

On January 20, 2015, Martin found this note on her desk:

TO:           THE UNION PERSONNEL

FROM:        THE APD MANAGEMENT

THE NEW CHIEF HAS SPOKEN.  IT'S A NEW DAY IN THE COOK COUNTY ADULT PROBATION DEPARTMENT.

THE CHIEF IS NOT TAKING ANY MESS FROM THE UNION AND WE AS MANAGERS WERE ALSO INSTRUCTED NOT TO TAKE ANY MESS FROM THE UNION.

WE WERE TOLD TO TAKE CONTROL BACK FROM THE UNION, BECAUSE THE UNION DOES NOT RUN THIS DEPARTMENT.  CHIEF, LAVONE HAYWOOD SAID THAT IF YOU SAY ANYTHING THAT WE DO NOT AGREE WITH, THEN WE ARE INSTRUCTED TO SHUT THE INVESTIGATION MEETING DOWN!!!!!!!

THE UNION'S TIME IS UP!!!!!!!!

YOU DO NOT WORK FOR **ASFSCME** [sic]**!**

YOU WORK FOR **THE ADULT PROBATION DEPARTMENT!**

YOU NEED TO DECIDED [sic] IF YOU WANT TO **RISK** YOUR CHILDREN NOT EATING, BECAUSE YOU ARE DEFENDING PEOPLE WHO DON'T DO THEIR WORK AND LIE ABOUT AND JUSTIFY THEIR ACTIONS.

**<u>OR</u>**

DO YOU WANT TO KEEP YOUR JOB AND CONTINUE TO FEED YOUR CHILDREN.

Doc. 116-7; Docs. 127-3, 127-4 at ¶ 10. Although the letter was not addressed to Martin, it was accompanied by a sheet of paper with her name on it. Doc. 127-4 at ¶ 10; Doc. 128-2 at ¶ 6; Doc. 83-6 at 1. The union's president, James Dunaway, received an identical letter. Docs. 146, 150 at ¶ 11. Martin and Dunaway do not know who wrote the letter but believe it came from APD management. Doc. 127-4 at ¶ 11; Doc. 127-3 at ¶ 13; Docs. 146, 150 at ¶ 13.

Once APD Chief Probation Officer Lavone Haywood learned about the letter, he told the rest of APD management that it was unacceptable and that he would hold accountable anyone found responsible. Doc. 127-3 at ¶ 3; Doc. 127-4 at ¶ 12; Doc. 116-8 at 18. Although Haywood himself did not investigate who wrote and sent the letter, he instructed Assistant Chief Probation Officer Matthew Sobieski and Human Resources Director Noreen Larson to do so. Doc. 127-3 at ¶¶ 4, 6; Docs. 146, 150 at ¶ 10. Over 100 APD employees work in the Leighton Courthouse's lower level without video surveillance, and the investigation never discovered the letter's author(s). Doc. 127-3 at ¶¶ 12-13; Doc. 127-4 at ¶¶ 4-5, 11.

Lacking confidence in APD's investigation, Dunaway wrote to Cook County Circuit Court Chief Judge Timothy Evans to complain about the anti-union letter, describing it as a "blatant attempt to threaten and intimidate the union." Docs. 146, 150 at ¶¶ 12, 14 (quoting Doc. 83-7 at 1). (County Defendants object to Dunaway's letter to Chief Judge Evans on relevancy and hearsay grounds. Doc. 146 at ¶ 12. Dunaway's letter is not hearsay for the purpose of showing that Chief Judge Evans was made aware of the anti-union letter. *See* Fed. R. Evid.

801(c)(2); *Daniel v. Cook Cnty.*, 833 F.3d 728, 735-36 (7th Cir. 2016) ("[T]he district court correctly held that the Report could be offered for the non-hearsay purpose of proving the sheriff knew of the problems described in the report."). Dunaway's letter is relevant for the same reason.) Although Chief Judge Evans did not respond to Dunaway in writing, he met with Martin and Dunaway on January 28, 2015. Docs. 146, 150 at ¶ 15; Doc. 102-6 at ¶ 4.

**B.      Fall 2015 Complaints About Martin's Hijab**

In September 2015, APD probation officer Megan Nielsen forwarded to APD Deputy Chief Probation Officer Darryl Gray an email that she had previously sent her supervisor complaining that Martin's headwear violated APD's dress code. Doc. 127-4 at ¶¶ 15-16, 18; Doc. 127-3 at ¶¶ 5, 18-19. When Gray met with Martin about Nielsen's complaint, Martin explained to Gray that, as a practicing Muslim, she wears a hijab, which can be a bandana, a scarf, or a hat. Doc. 127-4 at ¶¶ 13, 19; Doc. 127-3 at ¶ 19. Martin advised Gray that several other people in the office wore unauthorized hats, so APD management required those people to remove them. Doc. 127-4 at ¶ 20; Doc. 116-1 at 17. (Martin denies this fact, asserting that APD employees were regularly allowed to wear hats, Doc. 127-4 at ¶ 20, but the evidence she cites, Docs. 131-9, 131-10, 131-11 (undated photographs of unidentified persons wearing hats); Doc. 116-11 at 24-26 (Gray testifying about those pictures without stating when they were taken), does not support her denial. As a result, the fact is deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B) (noting that denial of a fact asserted by the movant requires "specific references to the affidavits, parts of the record, and other supporting materials relied upon"); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (quoting *Cracco v. Vitran Express,*

*Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880, 884 (7th Cir. 2012) (similar).)  When he circled back with Nielsen, Gray did not tell her about Martin's religious beliefs and instead stated only that he had "addressed" the headwear issue with Martin.  Doc. 127-4 at ¶ 22 (quoting Doc. 116-9 at 15); Doc. 127-3 at ¶ 20.

When Gray in October 2015 received additional complaints from Nielsen and APD probation officer Mary Galazkiewicz about Martin's headwear, Gray reiterated that the issue had been resolved.  Doc. 127-4 at ¶¶ 24-25, 27; Doc. 127-3 at ¶¶ 19-20.  Gray nonetheless met with Martin to discuss the more recent complaints.  Doc. 127-4 at ¶ 28; Doc. 127-3 at ¶ 19.  When Martin asked Gray who had complained about her hijab, Gray declined to answer, though on one occasion he responded, "These are your union members.  You know who it is."  Doc. 127-3 at ¶¶ 19, 35 (quoting Doc. 116-1 at 27); Doc. 127-4 at ¶ 21.

After Martin did not wear her hijab on several days in December 2015, Gray approached her about her apparently intermittent religious attire.  Doc. 127-4 at ¶ 29; Doc. 127-3 at ¶¶ 21-22.  Martin told Gray that she was not wearing her hijab due to a medical issue, so Larson (as noted, the Human Resources Director) asked that she provide supporting medical documentation.  Doc. 127-4 at ¶¶ 29-30; Doc. 127-3 at ¶ 22.  Once Martin provided a doctor's note stating that she should cover or uncover her scalp as needed due to a medical condition, no one from APD's management or human resources again questioned her about her hijab.  Doc. 127-4 at ¶¶ 31-32; Doc. 127-3 at ¶ 22; Docs. 146, 150 at ¶¶ 16-17.  On December 16, 2015, a day before she provided the medical note, Martin filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") about the request for medical documentation and Gray's meetings with her about her hijab.  Doc. 127-4 at ¶ 1; Docs. 146, 150 at ¶ 18; Doc. 116-2.

### C. Anonymous December 2015 Anti-Muslim Note to Martin

Although Larson and Gray claim that they never told anyone about Martin's religious beliefs, on December 18, 2015 Martin found an unsigned note on her desk that arranged photocopied letters cut from a magazine or newspaper to say: "What R U an Isis Muslim no bombs allowed." Docs. 146, 150 at ¶ 19 (quoting Doc. 116-15); Doc. 127-4 at ¶¶ 34-35. Martin showed the note to Dunaway, who informed Chief Judge Evans, Larson, and Haywood. Doc. 127-4 at ¶ 36; Docs. 146, 150 at ¶ 20. Martin encountered Gray, who, after obtaining a copy of the note, met with Larson and Haywood. Doc. 127-3 at ¶¶ 25-26; Doc. 127-4 at ¶¶ 37, 40. After that meeting, Gray asked Martin to write a report so that the Cook County Sheriff could investigate. Doc. 127-3 at ¶ 27; Doc. 127-4 at ¶¶ 42-43.

Martin's two initial drafts of the report stated that Gray yelled at her when she stopped in her supervisor April Mohn's office immediately after he asked her to photocopy the note for him, but Sobieski (the Assistant Chief Probation Officer) twice directed Martin to delete that reference to Gray. Doc. 127-3 at ¶¶ 27-28; Docs. 146, 150 at ¶¶ 21-22; Doc. 127-4 at ¶¶ 38, 42. The report Martin submitted on December 22, 2015 did not mention Gray's yelling at her. Docs. 146, 150 at ¶ 22; Doc. 127-4 at ¶¶ 42, 44; Doc. 127-3 at ¶ 28. On August 4, 2016, Martin amended her IDHR charge to add allegations about the "intimidating, offensive and harassing" anti-Muslim note and APD's ineffective reaction. Doc. 127-4 at ¶ 2; Doc. 127-3 at ¶ 48; Doc. 116-3.

Gray submitted Martin's report and a copy of the note to the Sheriff's Office, which informed him that the evidence was insufficient to justify a full investigation. Doc. 127-4 at ¶¶ 44-45; Doc. 127-3 at ¶¶ 31-32; Doc. 116-11 at 36. Martin does not know who wrote the note but suspects it was Galazkiewicz, whom she believes was told by APD management about her

faith. Doc. 127-4 at ¶ 47; Doc. 127-3 at ¶ 38. Martin never told APD management of her suspicion that Galazkiewicz wrote the note, and Galazkiewicz denies having done so. Doc. 127-4 at ¶¶ 47-48; Doc. 127-3 at ¶ 38.

Sobieski and Larson followed up on Martin's complaint that Gray behaved inappropriately after Martin told him about the letter. Doc. 127-4 at ¶ 46; Doc. 127-3 at ¶ 30; Doc. 116-16 at 39-49; Doc. 116-26 at 48; Doc. 120-14. Sobieski interviewed two witnesses who saw Gray yell at Martin, and Larson told Gray that he should not have done so. *Ibid*. (Martin submits that Sobieski and Larson never looked into her complaint about Gray's conduct. Doc. 127-4 at ¶ 46; Doc. 127-3 at ¶ 30. However, the testimony that Martin cites does not contradict the fact that Sobieksi interviewed witnesses and that Larson confronted Gray concerning his conduct towards Martin. Doc. 116-1 at 29 (Martin not mentioning Larson or Sobieski); Doc. 116-11 at 30 (Gray testifying that Larson never discussed Martin's IDHR charge before the IDHR factfinding conference), 38 (Gray testifying that Sobieski never discussed Martin's allegations with him), 40 (Gray testifying about events unrelated to the December 18, 2015 letter). As a result, Martin fails to properly dispute that Sobieksi and Larson followed up internally about her complaint that Gray behaved inappropriately, so those facts are deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B); *Curtis*, 807 F.3d at 218; *Keeton*, 667 F.3d at 880, 884.)

Martin felt that her relationship with Gray deteriorated after that episode. Doc. 127-3 at ¶¶ 33-34; Doc. 127-4 at ¶ 75. Specifically, Martin noticed that Gray repeatedly would remind her to tell her supervisor when she was going to union meetings, would advise her to return to the office before the end of the day unless her supervisor allowed her not to return, and would sometimes talk to her in a derogatory manner or not speak to her at all. Doc. 127-3 at ¶ 34; Doc.

127-4 at ¶ 75.  Martin also recalls Gray being upset about boxes of union materials and telling her that the boxes are "the union's problem," meaning that they were "[her] problem."  Doc. 127-3 at ¶¶ 36-37.  On another occasion, Gray complained about Martin's radio being too loud. Doc. 127-4 at ¶ 75.

### D.  Martin's September 2016 Suspension

On June 14, 2016, while walking in the Leighton Courthouse accompanied by Mohn, Martin lent her cellphone to someone associated with Durk Banks, a musical artist also known as Lil Durk, who was a probationer assigned to APD probation officer David Neely.  Doc. 127-3 at ¶¶ 43, 46; Doc. 127-4 at ¶ 50.  Ever since 2013, OCJ has prohibited cellphones in the Leighton Courthouse, with an exception for judges, attorneys, law enforcement, and courthouse employees.  Doc. 127-3 at ¶ 46; Doc. 127-4 at ¶ 51; Doc. 116-18 at 3-4.  Martin contends that the cellphone policy did not prevent someone allowed to have a cellphone from lending it to someone not allowed to have a cellphone, but presents no evidence that this supposed exception applied to APD officers and probationers or that she mentioned the exception during the disciplinary proceedings (of which more in a moment) associated with the June 14, 2016 incident.  Doc. 127-3 at ¶ 46; Doc 127-4 at ¶ 54; Doc. 128-2 at ¶ 16.

On June 15, 2016, Neely submitted an incident report asserting that Mohn and Martin had interfered with his official duties by telling him that he should not pursue a probation violation against Lil Durk.  Doc. 127-3 at ¶ 43; Doc. 127-4 at ¶ 52; Docs. 146, 150 at ¶ 28; Doc. 120-19. At that point, Neely had been suspended from the practice of law for two years for submitting false claims for reimbursement and double-billing as a public defender.  Docs. 146, 150 at ¶ 31; Doc. 127-4 at ¶ 58.  (OCJ objects that this is improper character evidence under Evidence Rule 404(b), Doc. 150 at ¶ 31, but the fact is admissible as evidence of Neely's character for

truthfulness that, Martin submits, Defendants should have considered in evaluating his allegations against her. Doc. 127 at 10; *see* Fed. R. Evid. 608(b).) Larson later obtained video surveillance footage of Martin's and Mohn's interactions with Lil Durk and his entourage, which showed Durk's associate receiving and using Martin's cellphone. Doc. 127-3 at ¶ 46; Doc. 127-4 at ¶ 53; Doc. 120-20 at 3.

On July 5, 2016, Martin, Neely, Dunaway, Gray, Larson, and APD Deputy Chief Ronnie Woodfork met to discuss Neely's allegations. Doc. 127-3 at ¶¶ 44-45; Doc. 127-4 at ¶ 54; Docs. 146, 150 at ¶¶ 29-30; Doc. 120-20 at 3. Martin stated that she "[did]n't remember anyone using [her] cellphone" on June 14. Doc. 127-4 at ¶ 54 (quoting Doc. 116-1 at 37); Doc. 127-3 at ¶ 45. (Martin denies making that statement, Doc. 127-4 at ¶ 54, but cites no contrary evidence, and the proposition that she made the statement is supported by the evidence OCJ cites, Doc. 116-1 at 37, so the fact is deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B); *Curtis*, 807 F.3d at 218; *Keeton*, 667 F.3d at 880, 884.) Martin initially stated that she did not remember anything about what had happened on June 14, but as the meeting continued, she gave inconsistent recollections about the day. Docs. 146, 150 at ¶ 29; Doc. 127-4 at ¶ 54; Doc. 120-20 at 3.

After concluding that video evidence of Martin's interaction with Lil Durks's entourage substantiated Neely's account and contradicted Martin's, and upon noting Martin's inconsistent statements about what occurred on June 14, Gray, Woodfork, and Larson recommended to Haywood on August 2, 2016 that Martin receive a twenty-day suspension for violating the cellphone policy and behaving unprofessionally. Doc. 127-3 at ¶¶ 47, 49; Doc. 127-4 at ¶¶ 56; Doc. 116-19 at 1-2. Upon considering that recommendation, Haywood on September 14, 2016 suspended Martin for fifteen days without pay on the grounds that she spent hours away from her desk "attempting to influence an officer to refrain from the execution of his duties," that she

"allowed an unauthorized individual to use [her] cell phone" at the courthouse, that and her actions raised questions about her "sound judgment and professional comportment." Doc. 116-20; Doc. 127-4 at ¶¶ 57, 59; Doc. 127-3 at ¶ 50. Mohn, a non-Muslim who did not have a pending IDHR charge, was suspended twenty days for the same incident. Doc. 127-3 at ¶ 55; Doc. 127-4 at ¶ 61. There is no evidence that Mohn lent anyone her cellphone. *Ibid*.

On September 14, 2016, Martin filed a charge of discrimination with the IDHR alleging that her fifteen-day suspension was retaliation for her previous IDHR charge. Doc. 127-4 at ¶ 3; Doc. 127-3 at ¶ 52; Doc. 116-4. Martin also pursued a union grievance, which was initially denied and then proceeded to arbitration. Doc. 127-3 at ¶¶ 51, 53-54; Doc. 127-4 at ¶ 60; Docs. 146, 150 at ¶ 32. Before Martin submitted the grievance, Gray, Larson, and Haywood (and, presumably, Woodfork) were not aware that Neely had been suspended from practicing law, though Gray and Larson testified that their knowledge of Neely's suspension would not have changed their conclusions about Martin's conduct and recommendation that she be suspended. Doc. 127-4 at ¶¶ 58-59. Martin later learned that Galazkiewicz asked another union official how Martin could remain the union steward in light of her suspension. Doc. 127-3 at ¶ 39.

### E.     Martin's January 2017 Request for Prayer Space

Due to office remodeling, Martin was moved from her office to a cubicle next to Galazkiewicz in December 2016. Doc. 127-4 at ¶¶ 67, 74. Because she no longer had a secluded workspace, Martin asked on January 18, 2017 for a private prayer space as a religious accommodation. *Id*. at ¶¶ 66-67; Doc. 127-3 at ¶ 56. After seeking more details about the request, Larson approved Martin to use a supervisor's office while Larson attempted to find a more permanent prayer space. Doc. 127-4 at ¶ 68; Doc. 127-3 at ¶ 57. Martin felt

uncomfortable using the supervisor's office to pray, so Larson asked her for more information to find a suitable space.  Doc. 127-3 at ¶¶ 58-59, 61; Doc. 127-4 at ¶ 69.

On February 8, 2017, Larson emailed Martin that Gray would show her a new temporary prayer space.  Doc. 127-3 at ¶ 62; Doc. 127-4 at ¶ 70.  However, Larson neglected to copy Gray on the email, so Gray did not contact Martin until Martin emailed Larson on March 7, 2017 to tell her that Gray had not shown her the prayer space.  Doc. 127-4 at ¶ 70; Doc. 127-3 at ¶¶ 63-64.  Martin never used the space because it was next to Gray's office and because there were rodent traps and droppings due to a rodent issue in the Leighton Courthouse.  Doc. 127-4 at ¶ 71.  Despite not using the space, Martin regularly prays at work; Gray told Martin that she had to pray on her breaks, while Larson encouraged her to use her breaks to pray.  *Id*. at ¶¶ 72-73.

### F.    Anonymous March 2017 Graffiti and Workplace Difficulties

At a January 23, 2017 conference that Gray and Larson attended concerning her IDHR charges, Martin mentioned that APD probation officer Karla Williams constantly watched YouTube and never worked.  Doc. 127-4 at ¶ 62; Doc. 127-3 at ¶ 40.  Based on Williams's later statement that "her deputy chief told her that her chief union steward was down there referencing her name," Martin believes that Gray relayed her comments to Williams.  Doc. 127-3 at ¶ 40 (quoting Doc. 116-1 at 43).  After the conference, Martin noticed that Williams and Williams's friends stopped talking to her, that Williams would talk loudly whenever she was near, and that Williams's daughter would walk past her quickly.  Doc. 127-4 at ¶ 63; Doc. 127-3 at ¶ 40.  Martin submitted incident reports in February and March 2017 alleging that her coworkers had bullied her.  Doc. 127-3 at ¶¶ 41-42; Doc. 127-4 at ¶ 63.

On March 16, 2017, Martin found graffiti on a stall door in the women's bathroom that read: "COUNTY STANK BITCH C MARTIN."  Docs. 146, 150 at ¶ 34; Doc. 127-4 at ¶ 64;

Doc. 127-3 at ¶ 65. Martin told Gray and Sobieski about the graffiti and sent an incident report to them and two union officials. Doc. 127-3 at ¶¶ 66-68. Sobieski told OCJ about the graffiti, *id*. at ¶ 69, and Larson wrote Martin to advise that human resources knew about it and that she should contact Larson if she felt unsafe, *id*. at ¶ 70; Doc. 127-4 at ¶ 64. Gray filed a report with the Sheriff's Office, and OCJ investigated the graffiti and Martin's allegations of harassment against Williams and Williams's friends. Doc. 127-4 at ¶ 65. Although a dozen people were interviewed as part of OCJ's investigation, neither OCJ nor the Sheriff's Office determined who was responsible for the graffiti. *Ibid*.; Doc. 127-3 at ¶ 71. (The materials Martin cites in denying that an actual investigation occurred do not support her denial or even mention the graffiti, Doc. 127-4 at ¶ 65; Doc. 127-3 at ¶ 71, while the evidentiary materials cited by Defendants show that the police and OCJ did investigate, Doc. 120-31; Doc. 116-23; Doc. 116-24, so the above-stated facts are admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B); *Curtis*, 807 F.3d at 218; *Keeton*, 667 F.3d at 880, 884.)

### Discussion

The operative complaint alleges that OCJ violated Title VII by discriminating against Martin based on her religion and retaliating against her after she complained to the IDHR. Doc. 46 at ¶¶ 150-175. The operative complaint further alleges that OCJ and County Defendants retaliated against her for her union activities in violation of the First Amendment and that OCJ had a custom of unconstitutional harassment. *Id*. at ¶¶ 176-191, 198-204.

In her summary judgment opposition brief, Martin contends for the first time that her Title VII hostile work environment claim is also against County Defendants. Doc. 127 at 10 ("Contrary to the assertion that [her] claim against [County Defendants] is limited to a § 1983 First Amendment retaliation claim based on her union activity, Martin contends that [they]

personally created her hostile work environment.") (footnote and internal quotation marks

omitted). Martin may not pursue the Title VII hostile work environment claim against County

Defendants. As the Seventh Circuit has held, "a party may neither amend [her] pleadings by

argument in opposition to summary judgment nor introduce new theories of liability in

opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir.

2017) (internal quotation marks omitted). In any event, supervisors and coworkers "cannot be

held liable in [their] individual capacity under … Title VII." *Silk v. City of Chicago*, 194 F.3d

788, 797 n.5 (7th Cir. 1999); *see also Passananti v. Cook Cnty.*, 689 F.3d 655, 677 (7th Cir.

2012) (collecting cases).

## I.     Title VII Claims

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to

discriminate against any individual with respect to [her] compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's antiretaliation provision "prohibits retaliation

against employees who engage in statutorily protected activity by opposing an unlawful

employment practice or participating in the investigation of one." *Lord v. High Voltage

Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). Both

provisions protect against "the creation of a hostile work environment that is severe or pervasive

enough to affect the terms and conditions of employment." *Id*. at 561 (internal quotation marks

omitted); *see also Flanagan v. OCJ*, 893 F.3d 372, 375 (7th Cir. 2018) (recognizing a claim for a

"retaliatory hostile work environment" under Title VII). Martin alleges that OCJ discriminated

against her on the basis of her religion, retaliated against her by suspending her for engaging in

protected activity, and subjected her to a hostile work environment on the basis of her religion and her IDHR charges. Doc. 46 at ¶¶ 150-175.

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that her protected characteristic or activity caused an adverse employment action. *Id*. at 765. Although a plaintiff may satisfy her burden using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018) ("In *Ortiz*, … we left *McDonnell Douglas* burden-shifting as a viable option for pursing employment discrimination claims."), Martin does not press that framework in her brief, Doc. 127 at 6-7, thereby forfeiting any reliance thereon. *See Gates*, 916 F.3d at 641 ("The district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]."); *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Accordingly, the court will conduct the analysis directed by *Ortiz* and "assess cumulatively all the evidence" on which Martin relies "to determine whether it permits a reasonable factfinder to determine" that OCJ took an adverse employment action against her because of her religion or in retaliation for her IDHR charges. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 883 (7th Cir. 2018) ("The parties have not framed their arguments using the *McDonnell Douglas* burden shifting framework, but rather have simply disputed whether sufficient evidence has been produced to support a jury verdict.").

### A. Religious Discrimination

On a Title VII religious discrimination claim, "the fundamental question at the summary judgment stage is simply whether a reasonable jury could … conclude that the plaintiff's … religion … caused the adverse employment action." *Barbera*, 906 F.3d at 628 (internal quotation marks omitted). OCJ contends that it is entitled to summary judgment because no reasonable jury could find that Martin suffered an adverse employment action due to her religion. Doc. 115 at 8-10. Martin's opposition brief defends her Title VII retaliation and hostile work environment claims, but not her religious discrimination claim. Doc. 127 at 6-15. As a result, Martin has abandoned that aspect of her Title VII claim. *See Gates*, 916 F.3d at 941; *Nichols*, 755 F.3d at 600; *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its [opposition] to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett abandoned its claim."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the plaintiff] lost the opportunity to urge it in both the district court and this court."), *overruled in other part by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

### B. Retaliation

"To establish a *prima facie* case of retaliation under Title VII, [Martin] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Although the operative complaint alleges "many … retaliatory actions," Doc. 46 at ¶ 168, Martin's opposition brief predicates her Title VII retaliation claim exclusively on her fifteen-day suspension, Doc. 127 at

10, so she has abandoned any argument that other adverse employment actions might predicate a Title VII retaliation claim. *See Gates*, 916 F.3d at 941; *Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038. OCJ does not dispute that Martin's IDHR charges constitute protected activity or that her fifteen-day suspension constitutes a materially adverse action, but instead contends that Martin has not adduced sufficient evidence for a reasonable jury to find that her protected activity caused the suspension. Doc. 115 at 15.

"To prove causation, [Martin] must show that the desire to retaliate was the but-for cause of" her suspension, meaning that it "would not have occurred in the absence of the alleged" protected activity. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (internal quotation marks omitted); *see also Mollet*, 926 F.3d at 897 (holding that the plaintiff must show that "the protected activity was *the* but-for cause of the adverse action," not merely "*a* but-for cause"). "In the Title VII retaliation context, causation can be established by … suspicious timing, a pretextual explanation for the [adverse action], and evidence that similarly situated employees were treated differently," among other evidence. *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (internal quotation marks omitted).

The timing of Martin's September 14, 2016 suspension, on the one hand, and her December 16, 2015 and August 4, 2016 IDHR charges, on the other, does not establish or even meaningfully advance the causation element of her retaliation claim. *See Baines v. Walgreen Co.*, 863 F.3d 656, 665 n.3 (7th Cir. 2017) ("[W]hen there is a long gap between a protected activity and an adverse employment action, evidence of 'suspicious timing' alone is insufficient to find a causal connection.") (collecting cases), Martin's December 16, 2015 charge preceded her suspension by some nine months, severely undermining any inference of causation. *See Silk v. Bd. of Trs.*, 795 F.3d 698, 710 (7th Cir. 2015) (holding that an interval of "a few weeks" was

insufficient "to create a triable issue" on causation) (internal quotation marks omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) ("[A] seven-week interval, standing alone, is insufficient to create a material issue regarding causation."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (same, as to intervals of "approximately five weeks" and "more than two months"); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2002) ("[S]ix months is too long to establish a causal link without more."). And Martin submitted her August 4, 2016 IDHR charge two days *after* APD supervisors recommended that she be given a twenty-day suspension. Doc. 127-4 at ¶¶ 56; Doc. 116-19 at 1-2. Given this, it would be impossible to find that the IDHR charge caused the recommendation. *See Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (holding that "no reasonable jury could find that [the plaintiff] was terminated *because of* her FMLA leave request on May 9" where "the undisputed facts show that [a manager] had already decided to terminate [her] on May 7"); *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.") (internal quotation marks omitted). Nor could a reasonable jury find from the timing alone that Martin's IDHR charge caused Haywood some six weeks later to impose a *lighter* suspension on her (fifteen days) than the suspension recommended by APD supervisors (twenty days). Doc. 116-20; Doc. 127-4 at ¶¶ 57, 59.

When considering the timing along with the other evidence, a reasonable jury still could not find that the grounds for Martin's suspension were pretextual. "[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690,

698 (7th Cir. 2017) (alteration and internal quotation marks omitted); *see also Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the [adverse action].") (internal quotation marks omitted).  Martin does not deny that the grounds articulated by OCJ for her suspension were facially valid: that she spent excessive time around Lil Durk and his entourage; that she gave Durk's associate her cellphone; that she attempted to dissuade Neely from pursuing a probation violation against Durk; and that she gave vague and inconsistent statements at the July 5, 2016 investigatory meeting about Neely's incident report.  Doc. 127-4 at ¶¶ 50-57, 59; *see Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) ("Where multiple reasons are given [for an adverse action], as in this case, the plaintiff faces a greater challenge [in establishing pretext].") (collecting cases). Instead, Martin argues that those grounds were pretextual, citing Neely's lack of credibility as a suspended attorney and her strong work record.  Doc. 127 at 10.

Even assuming (incorrectly) that Neely's prior suspension fatally undermined his credibility, *cf. Montaño v. City of Chicago*, 535 F.3d 558, 567 (7th Cir. 2008) ("[P]erjury is a circumstance to be weighed … in determining a witness's credibility rather than a ground for … treating the witness's entire testimony as unworthy of belief.") (internal quotation marks omitted), Gray, Woodfork, Larson, and Haywood also relied on a surveillance video of the Lil Durk incident that corroborated Neely's account and undermined Martin's.  Doc. 127-4 at ¶¶ 53-55, 57; *see Burton*, 851 F.3d at 698 ("We intervene only where an employer's reason for an adverse action is without factual basis or is completely unreasonable.") (alteration and internal quotation marks omitted); *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (rejecting a pretext argument where the investigators "reviewed surveillance footage" as

part of a "thorough and transparent" investigation that supported legitimate grounds for discipline). Additionally, just as Neely's prior untruthfulness does not conclusively establish that he was untruthful here, Martin's previously excellent work record does not rebut OCJ's findings that she behaved inappropriately in connection with Lil Durk, let alone show that OCJ did not believe in its findings. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("The question is not whether [the plaintiff] *ever* satisfied [her employer's] expectations, but whether she met the [employer's] expectations *at the time she was* [suspended]."); *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002) ("Although [the plaintiff] attempts to argue that his prior record demonstrates that he was meeting the Service's legitimate expectations, the issue is simply whether he was meeting the Service's expectations at the time of the [adverse action].").

Martin asserts in her Local Rule 56.1(b)(3)(B) response that OCJ's cellphone policy did not prevent her from lending her cellphone to Lil Durk's associate and that she was away from her desk for an extended period because her supervisor wanted to "walk and talk." Doc. 127-4 at ¶¶ 51, 53-57. But by failing to explain in her opposition brief how those facts defeat summary judgment, Martin has forfeited the point. *See Riley*, 909 F.3d at 190 (holding that a plaintiff forfeited arguments against summary judgment when she merely listed facts "to support her discrimination and retaliation claims, leaving it up to the district court to surmise which facts supported which claim and how those facts operated to defeat summary judgment as to each claim"); *see also M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Even setting aside forfeiture, the fact that Mohn (Martin's supervisor) received a *longer* suspension for similar conduct involving Lil Durk—despite not lending anyone her cellphone—shows that OCJ did not improperly single out Martin

for discipline. *See Filippo v. N. Ind. Pub. Serv. Corp.*, 141 F.3d 744, 749 (7th Cir. 1998) ("Far from suggesting that [she] was treated differently from others, these facts suggest that [the plaintiff] received exactly the same treatment as other employees."); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (noting that a pretext argument that alleges "selective enforcement of an employer's rules" can turn on "comparator evidence"). Accordingly, a reasonable jury could not find that Martin's fifteen-day suspension constitutes unlawful retaliation under Title VII.

### C.    Hostile Work Environment

To survive summary judgment on her hostile work environment claim, Martin must adduce evidence sufficient for a reasonable jury to find that: "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior [under Title VII]; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego*, 907 F.3d at 1015 (internal quotation marks omitted); *see also Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) ("We consider the hostile work environment claim under a totality of the circumstances approach.") (internal quotation marks omitted). OCJ contends that no reasonable jury could find that much of the harassment of which Martin complains was due to a protected characteristic or activity and thus is not actionable under Title VII, and that the potentially actionable harassment was not severe or pervasive. Doc. 115 at 10-12. In the alternative, even if the actionable harassment was sufficiently severe or pervasive, OCJ contends that there is no basis for employer liability. *Id*. at 12-14.

Although Martin need not "identify an explicitly [discriminatory or retaliatory] dimension of the challenged conduct to sustain" her hostile work environment claim, she still

must "attribute a [discriminatory or retaliatory] character or purpose to it." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (internal quotation marks omitted), *aff'd*, 570 U.S. 421 (2013); *see also Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected class].") (internal quotation marks omitted); *Orton-Bell v. Indiana*, 759 F.3d 768, 774 (7th Cir. 2014) (holding in the context of a sex-based hostile work environment claim that the plaintiff must prove that the conduct occurred "*because* she was a woman," not that the conduct was "merely tinged with offensive sexual connotations"). Martin does not provide a developed response to OCJ's contention, Doc. 115 at 10-11, that the anonymous January 2015 anti-union letter, Williams's and her friends' harassment of Martin, and the March 2017 bathroom graffiti are insufficiently connected with her religion or protected activity to be actionable harassment under Title VII, thereby forfeiting the point. *See Gates*, 916 F.3d at 941; *Nichols*, 755 F.3d at 600; *see also M.G. Skinner*, 845 F.3d at 321. Even setting aside forfeiture, "the record in this case does not support a reasonable inference that" those episodes were sufficiently "connected to" Martin's religion or IDHR charges qualify as Title VII harassment, let alone that they satisfied the other elements of a Title VII hostile work environment claim. *Cole*, 838 F.3d at 897 (noting that calling the plaintiff "worthless," while "reprehensible," could "not amount to race discrimination solely because" he was "African-American"); *see also Lord*, 839 F.3d at 561 (describing a hostile work environment claim as a "nonstarter because [the plaintiff] has not established that his coworkers harassed him because of his" protected characteristic).

Instead, Martin focuses on Nielsen's and Galazkiewicz's complaints in Fall 2015 about her hijab and APD management's reaction; the anonymous December 2015 anti-Muslim note; Gray's coldness and occasional irascibility toward Martin; and APD management's handling of Martin's requests for prayer space in early 2017. Doc. 127 at 11, 13-14. To rise to the level of a hostile work environment, conduct "must be sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment." *Johnson*, 892 F.3d at 900 (internal quotation marks omitted). "In determining whether conduct is severe or pervasive enough to alter the conditions of employment, courts must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson*, 894 F.3d at 828. On the summary judgment record in this case, "no reasonable jury could find the [Title VII-related] conduct at issue severe or pervasive." *Johnson*, 892 F.3d at 901.

First, given the different kinds of head coverings (bandanas, hats, scarves) that Martin wore as a hijab and the inconsistency with which she wore any head coverings, coworkers' complaints and management's inquiries about whether she was violating APD's no-hats dress code were not unlawfully harassing. *See Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 451 (7th Cir. 2013) (noting that if managers presented with a religious accommodation request "had questions about whether the request was religious, nothing would have prevented them from asking [the plaintiff] to explain a little more about the nature of [the] request without risking … hostility to an employee's religion"). For similar reasons, Larson's undisputedly good-faith attempts to find Martin a suitable prayer space cannot be thought to have created or contributed to a hostile work environment. *See Porter v. City of Chicago*, 700 F.3d 944, 952-53 (7th Cir. 2012) (recognizing "that employers must engage in a dialogue with an employee

seeking a" religious accommodation to identify a "reasonable accommodation, not [necessarily] satisfaction of an employee's every desire") (internal quotation marks omitted).

Likewise, Gray's conduct—occasional silence and shortness toward Martin, and yelling at her one time—was "not objectively offensive, severe, or pervasive," even assuming it was sufficiently connected for Title VII purposes to her religion or IDHR complaints. *Abrego*, 907 F.3d at 1015 (affirming summary judgment on a hostile work environment claim despite evidence that the plaintiff's "supervisors were 'short-tempered, 'hostile,' unfairly critical, and disrespectful"); *see also Porter*, 700 F.3d at 956 ("Viewing the record before us in the light most favorable to [the plaintiff], the most we can say is that she was subject to sporadic inappropriate and rude comments by her supervisors, but offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.") (alteration and internal quotation marks omitted); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (holding conduct by the plaintiff's immediate supervisor to "fall far short of creating an actionable hostile work environment" even though he "treated her in a rude, abrupt, and arrogant manner" and "ignored her"). Finally, the anonymous anti-Muslim note, while reprehensible, cannot alone convert what was otherwise an insufficiently severely or pervasively offensive workplace into an actionably hostile work environment. *See Cole*, 838 F.3d at 896-97 (holding that "a racist sign posted somewhere, at some unknown time by some unknown person" did not rise to "severe or pervasive" harassment); *Hobbs v. City of Chicago*, 573 F.3d 454, 464-65 (7th Cir. 2009) (holding that vandalism to the plaintiff's car was "disgraceful, but that one act alone is not egregious enough to create a hostile work environment").

Moreover, even assuming that the anti-Muslim note was sufficiently offensive to qualify as severe harassment, Martin cannot establish OCJ's liability. Where, as here, there is no basis to believe that a supervisor was the harasser—indeed, Martin suspects that the note came from Galazkiewicz, her fellow probation officer, Doc. 127-4 at ¶ 47—an employer "is liable only if it was negligent either in discovering or remedying the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (internal quotation marks omitted). Martin contends that OCJ was negligent in that respect because (1) the note appeared two days after she provided her doctor's note justifying the intermittent wearing of her hijab, and (2) OCJ did not conduct a reasonable investigation into the note's source. Doc. 127 at 11-12, 14.

Martin's theory that the short interval between the time she disclosed her faith to management and the time the note appeared supports an inference that management disclosed her Muslim faith to her coworkers does not withstand scrutiny. Martin first disclosed to management her Muslim faith in September 2015, Doc. 127-4 at ¶¶ 19, 30, some three months before the note appeared in December 2015, which is insufficient standing alone to raise a reasonable inference that the former led to the latter. *See Silk*, 795 F.3d at 710; *Milligan*, 686 F.3d at 390; *Kidwell*, 679 F.3d at 967; *see generally Coleman v. City of Peoria*, 925 F.3d 336, 345 (7th Cir. 2019) ("Although [the plaintiff] is entitled to have all reasonable inferences drawn in [her] favor at this stage, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal quotation marks omitted). Indeed, even if APD management disclosed Martin's faith to her coworkers, that could hardly be thought to have invited or encouraged somebody to send her the awful note she received. And although the Sheriff could not conclude who wrote the note—which, as noted, was a photocopy of cut-out letters—no reasonable jury could find that APD staff behaved unreasonably (even if Gray

reacted insensitively toward Martin) by promptly discussing the note and days later referring the matter to law enforcement. *See Cole*, 838 F.3d at 898 (holding that "it was reasonable for the administration, having involved the university police, to leave the investigation to them" after the plaintiff discovered a noose, even where his supervisor reacted "insensitively"); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) ("[A] prompt investigation is the hallmark of a reasonable corrective action.") (internal quotation marks omitted); *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008) (rejecting employer liability even though the employer and the police department declined "to pursue the issue"—an "alleged assault"— due to "insufficient evidence").

Accordingly, even considering all of the potentially actionable harassment as a whole, no reasonable jury could find that the harassment was severe or pervasive, or (as to the anti-Muslim note) that OCJ was liable for it, so OCJ is entitled to summary judgment on the hostile work environment claim.

## II.    Section 1983 Claims

The complaint alleges under § 1983 that OCJ and County Defendants retaliated against Martin for her union activities in violation of the First Amendment and that OCJ had a widespread custom of unconstitutionally harassing probation officers. Doc. 46 at ¶¶ 176-191, 198-204. In seeking summary judgment, OCJ argues that it is not subject to § 1983 liability, Doc. 115 at 7-8, and County Defendants argue that Martin has not adduced evidence sufficient for a reasonable jury to find them personally liable, Doc. 119 at 8-14.

### A.    OCJ's § 1983 Liability

Martin asserts claims for First Amendment retaliation and unconstitutional harassment, the latter (and perhaps the former) under *Monell v. Department of Social Services of the City of*

*New York*, 436 U.S. 658 (1978).  Doc. 46 at ¶¶ 176-191, 198-204.  By not responding to OCJ's argument that it is not subject to § 1983 liability because it is not a "person" under § 1983, Doc. 115 at 7-8, Martin has forfeited those claims.  *See Gates*, 916 F.3d at 941; *Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038.

Even setting aside forfeiture, OCJ is correct on the merits.  States, including state agencies as "arm[s] of the state," "are not among the 'persons' covered by" § 1983.  *Sebesta v. Davis*, 878 F.3d 226, 231 (7th Cir. 2017); *see also Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719, 721 (7th Cir. 2009) ("The [Illinois] agency was properly dismissed because states are not 'persons' within the meaning of section 1983 and so cannot be sued under that section."); *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748-49 (7th Cir. 2005) ("The Court has been clear … that *Monell*'s holding applies only to municipalities and not states or states' departments.").  OCJ is part of the Circuit Court of Cook County, which in turn is a unit of state government.  *See Tibor v. Kane Cnty.*, 485 F. App'x 840, 840 (7th Cir. 2012) ("Circuit Courts of Illinois are units of state government, created by Article VI of the Illinois Constitution."); *Orenic v. Ill. State Labor Relations Bd.*, 537 N.E.2d 784, 795 (Ill. 1989) (recognizing that "the State" of Illinois is "personified by the chief judge of each circuit").  It follows that OCJ is not subject to § 1983 liability.  *See Haag v. Cook Cnty. Adult Probation*, 2018 WL 5249228, at *5 (N.D. Ill. Oct. 22, 2018) ("The [OCJ] is an office within Illinois's state court system, established by state statute.  That means that it is not a person and is not subject to liability under § 1983.") (citing 705 ILCS 35/1, 35/4.1).

### B.  First Amendment Retaliation

For her First Amendment retaliation claim, Martin "must show: (1) [s]he engaged in protected activity; (2) [s]he suffered a deprivation likely to deter future protected activity; and (3) [her] protected activity was a motivating factor in the defendants' decision to retaliate."

*Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). In defending that claim, Martin focuses on the anonymous January 2015 anti-union letter. Doc. 127 at 8. Although she also conclusorily asserts that "[a]ll the evidence in this case"—by which she means "[t]he many letters, emails, memoranda, exhibits, affidavits, the official Cook County Sheriff's Incident Report, and the depositions taken in this cause"—shows that "the exercise of her First Amendment rights … [through] her union activities and speaking out on matters of public concern are the motivating factors in Defendants' actions," *id*. at 8-9, her argument fails to identify what other deprivation(s) and motivating factor(s) support her First Amendment retaliation claim, thereby forfeiting those potential bases for her claim. *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 538 (7th Cir. 2017) (considering contentions "wholly unsupported by developed argument citing the record and supporting authority" to be "forfeited"); *Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010) (explaining that "[i]t is not th[e] court's responsibility to research and construct the parties' arguments," including by "hunt[ing] through the record") (internal quotation marks omitted). Moreover, Martin presents no developed argument or pertinent legal authority for her submission, Doc. 127 at 9, that a hostile work environment claim can be asserted within a First Amendment retaliation claim—let alone what the elements of such a subsidiary claim are and how they interact with the elements of a First Amendment retaliation claim—which provides another ground for forfeiture. *See M.G. Skinner*, 845 F.3d at 324.

County Defendants argue that no reasonable jury could find them liable for First Amendment retaliation. "Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation." *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (internal quotation marks omitted); *see also Colbert*, 851 F.3d at 657 ("The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct.").

Except for Haywood, no individual County Defendant is mentioned in the anonymous January 2015 anti-union letter, and no reasonable juror could conclude based on the summary judgment record that Sobieski, Gray, and Larson were part of "The APD Management" who purportedly sent the letter. Doc. 127-3 at ¶ 13 (Martin admitting that she does not know who wrote the letter); *see Colbert*, 851 F.3d at 657 (holding that the plaintiff was "unable to satisfy § 1983's personal-responsibility requirement at summary judgment" where "he was unable to identify which of the … searching officers had caused the alleged property damage because he was not allowed in the rooms while the officers conducted their search" and the "officers denied causing any property damage"); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 974 (7th Cir. 2003) ("[T]he evidence linking … one of *seventeen* officers who could conceivably have damaged the truck[] is simply too thin to survive summary judgment. No jury could reasonably infer from this evidence that [a particular officer] caused the damage … .").

As for Haywood, Martin has not adduced sufficient evidence for a jury to reasonably find that Haywood wrote the letter or left it on her desk. Indeed, the letter refers to Haywood in the third person, Doc. 116-7; Doc. 127-3 at ¶ 14, and Martin testified that she does not believe the letter came from Haywood, Doc. 127-3 at ¶ 13. It follows that Martin cannot show that the anti-union sentiments the letter attributed to Haywood in fact came from Haywood, let alone that he directed those sentiments toward Martin or was motivated by her union activities. *See Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) ("In order to demonstrate that a defendant was motivated to retaliate based on protected speech, the plaintiff must first produce evidence that the defendant knew about the protected speech."); *Diadenko v. Folino*, 741 F.3d 751, 756 (7th Cir. 2013) ("Adverse actions that follow close on the heels of protected speech can give rise to an inference of retaliation, but only if the person taking the adverse action knew of the protected

conduct.") (internal quotation marks omitted); *see also Graber v. Clarke*, 763 F.3d 888, 899 (7th Cir. 2014) ("In the end, the plaintiff must demonstrate that, but for [her] protected speech, the employer would not have taken the adverse action.") (internal quotation marks omitted).

Accordingly, because no reasonable jury could conclude that County Defendants were personally responsible for the anonymous January 2015 anti-union letter or that the statements the letter attributed to Haywood amounted to First Amendment retaliation by him, County Defendants are entitled to summary judgment on that claim.

### Conclusion

OCJ's and County Defendants' summary judgment motions are granted. Martin's indemnification claim against Cook County rises or falls with her claims against the County Defendants, Doc. 46 at ¶¶ 205-208; Doc. 119 at 14-15, so the County is entitled to summary judgment as well. Judgment will be entered for Defendants and against Martin.

August 8, 2019

_____

United States District Judge